## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**KARMEN L. YOUNG**  )
**3885 SW 90th Avenue**  )
**Maramar, Florida 33025-7619**  )
  )
**Plaintiff,**  )
  )
**v.**  )  **Case No.**_____
  )
**MARCIA L. FUDGE, SECRETARY,**  )
**U.S. DEPARTMENT OF HOUSING**  )
**and URBAN DEVELOPMENT**  )
**451 77th Street SW, Suite 2106**  )
**Washington, DC 20410-0001**  )
  )
**Defendants.**  )

---

## COMPLAINT

Karmen Young ("Young" or "Plaintiff"), by his undersigned Counsel, brings this cause of action against her former employer, United States Department of Urban Housing and Development, Office of Government National Mortgage Association ("HUD GNMA/Ginnie Mae" or "Defendant"), alleging discrimination on the basis of her race (African-American), color (Darker Complexion), sex, (Female), retaliation (prior exercise of her EEO rights), in violation of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991, age, (over 40), in violation of the Discrimination in Employment Act, of 1967 as amended (ADEA ), 29 U.S.C. §§ 621–634.

## I. JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action and Plaintiff's claims under 28 U.S.C. § 1331 because plaintiff's claims arise under the laws of the United States.

2.    Venue is proper in the United States District Court, for the District of Columbia, under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §1391, because the unlawful employment practices were committed and the employment records were maintained, in whole or in part, in this District.

## II. PARTY

3.    Plaintiff, Karmen Young, is a citizen of the United States. She resides in Florida, and is over the age of majority. Plaintiff's employment with Defendant ended on October 25, 2013.

4.  Defendant, United States Department of Housing and Urban Development, Office of Government National Mortgage Association ("HUD GNMA/Ginnie Mae"), is a federal government agency. Defendant employed Plaintiff from 1995 to 2013, in last grade GS-13.

## III. ADMINISTRATIVE REMEDIES

5.    Plaintiff has exhausted all administrative remedies. Plaintiff timely sought pre-counseling with an EEO officer within forty-five (45) days of learning of the challenged decisions. On May 04, 2023, Agency, the U.S. Department of Housing and Urban Development, Equal Employment Opportunity Division (EEOD), made its final decision, issued a Final Order on Plaintiff's complaint captioned *Karmen Young v. Marcia L. Fudge, Secretary U.S. Department of Housing and Urban Development, Agency* No.: HUD-00069-2017: EEOC No.: 570-2018-00448X, and gave her ninety (90) calendar days from receipt, to file a civil action in an appropriate United States District Court. Hence, filing of her Complaint to this Court, is timely. **See Exhibit A.**

## IV.  INTRODUCTION

6.    Karmen Young brings this employment action against Marcia L. Fudge, Secretary U.S. Department of Housing and Urban Development in her official capacity.  Ms. Young alleges that her employer, the United States Department of Housing and Urban Development, Office of Government National Mortgage Association ("HUD GNMA/Ginnie Mae"), alleging

discrimination against her on the basis of her race, color, sex/gender; hostile work environment; retaliation against her based on her prior exercise of her Equal Employment Opportunity ("EEO") rights; and intentional, unfair and unlawful, denial of three opportunities for promotions, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, et seq, and in violation of the Age Discrimination in Employment Act of 1967 as amended, (ADEA),  29 U.S.C. §§ 621–634.

7.      In 2017, Plaintiff found out that she lost three (3) opportunities to be promoted, and reinstated back to her former federal job with Ginnie Mae (she worked for Ginnie May from 1995-2013 at GS-13, and attempted to be promoted and reinstated), because she was not selected for promotion to those positions, which she applied for.

8.      She also found out that those whose decisions and input as to who is selected for those positions, were her former management superiors, and colleagues, who prior and during the time of selection of candidates for promotion to those positions, had shown extreme discriminatory animus against Plaintiff; have intimidated her; did nothing to stop other employees from intimidating, assaulting, and harassing her, after she complained to them on numerous occasions; harassed and intentionally made, and spread in the workplace, false defamatory, hostile, and degrading statements against Plaintiff; threatened and warned Plaintiff not to again, file an EEO complaint; and had verbally made clear to Plaintiff, their intention of not ever promoting her, or allowing her back to work at HUD/Ginnie May, for no justifiable reason.

9.      As a result, Plaintiff strongly believes that that the decision makers who decided to interview her or select her for the positions she applied for, were influenced by their own discriminatory animus, and hostile feelings in making their decisions.

## V.  FACTS

### Employment Historical Background 1995 – 1998: Promotions from GS-6 to GS-9

10.    After leaving the federal government service to give birth to her son, Ms. Young was reinstated back into Federal Government Service, in February 1995, as a Secretary GS-6 at the U.S. Housing & Urban Development ("HUD"), Office of Departmental Equal Employment Opportunity.

11.    In May 1996, Ms. Young, competitively applied, was selected, and promoted to Secretary GS-7 at the HUD Government National Mortgage Association ("GNMA" or "Ginnie Mae") in the Office of Finance. Plaintiff reported to the Senior Vice President Michael Najjum.

13.    In March 1997, less than a year after her promotion to GS-7, Ms. Young received a performance cash award for superior service.

14.    Ms. Young will also be promoted again, in May 1997, to GS-8, and she earned the highest annual performance appraisal rating of outstanding.

15.    In addition, in 1997, Ms. Young was appointed, by George Anderson, Executive Vice President of Ginnie Mae, as the only FOIA Officer for the Federal Government's securities, traded on Wall Street.

16.    The following year, about November 1998, Ms. Young was promoted to GS-9.

17.    Over the course of 17 years, 1996 – 2013, Ms. Young worked for, and established a long-term professional career in federal service, at Ginnie Mae with no negative SF50 notices of "Personnel Actions" – in other words, Ms. Young had no disciplinary actions in her federal employment record.

18.    However, overtime, Ms. Young began to observe that her annual performance appraisal ratings were being lowered.

19.    Ms. Young spent over 70% of her Federal Civil Service professional career working for Ginnie Mae. She received numerous high performance appraisal ratings, performance awards, and special service awards.

Plaintiff's contributions to Ginnie Mae's Important Milestones

20.    Ms. Young enjoyed performing mortgage secondary markets work and grew up her professional career through the ranks at Ginnie Mae.

21.    Due to Ms. Young's contributions, Ginnie Mae was able to reach its first-ever $1 Trillion dollar mark in securities outstanding

22.    Ms. Young was often recognized by Ginnie Mae senior executive management for her specialized and expanding, technical and strategic knowledge, skills, and abilities.  As a result, management began assigning her more complex compliance-related work assignments that went beyond the scope of clerical duties a secretary would normally perform.

23.    Those additional technical work assignments to Plaintiff, were typically performed by more senior analysts at higher grades. For instance, Ms. Young assisted the Budget Officer, Maria McQueen ("McQueen"), Black/African-American female) with quantitative/qualitative data analytics, reconciliations, and compliance requirements related to the agency's financial and budget reporting to Congress.

24.    Part of the technical work assignments that Ms. Young assisted Ms. McQueen with, involved ensuring compliance with the Office of Management and Budget's ("OMB") Circular No. A-123 on Management's Responsibility for Enterprise Risk Management and Internal Control and Government Accounting Standards ("GAS"), so that agency budgetary plans can be

submitted to OMB and Congress, so that appropriations would be approved for agency

operations, salaries, and expenses.

25.     In addition, Ms. Young managed, the following critical projects:

- •      Ginnie Mae's Unclaimed Funds for investors;

- •      Analyzed and monitored repurchase and commitment authority allocated by

    Congress, used by issuers to conduct business with the agency, and required for

    Ginnie Mae operations and existence;

- •      Verified lenders (issuers) book-entry of Mortgage-Backed Securities ("MBS")

    security certificates;

- •      Reconciled the agency's general ledger;

- •      Provided hands-on assistance in the development of Ginnie Mae's Annual Report

    with contractors and senior executive staff;

- •      Trained and supervised other temporary employees on data entry functions;

- •      Assisted in the preliminary evaluation process - to determine lenders'

    approvability of commitment authority in order to securitize government-insured

    loans; and

- •      Applied compliance requirements, by noting deficiencies and performing

    qualitative and quantitative analysis of annual and quarterly financial statements

    of those lenders applying for Ginnie Mae program approval.

26.     1999: Selected as Associate Account Executive (Trainee) GS-5 to GS-11

27.     About May 1999 Ms. Young competitively applied, and was selected for the position of Associate Account Executive (Trainee) ("AAET") Upward Mobility position advertised at grade GS-5 with promotion potential to GS-11 to work in the Ginnie Mae, Office of Customer Service.

28.     For the Associate Account Executive position, Ms. Young was downgraded from a Secretary (Typing) GS-9 to grade GS-5. The lowering of her grade, concerned her, and she expressed that concern to Ginnie Mae Administrative Officer, Patricia Dougherty (white female), and requested a copy of the applicable human resource policy cited at HUD and/or Office of Personnel Management. It was difficult for her to get clarification on why the grade was lowered.

29.     Ms. Young, did not receive a copy of any agency policy that supported the lowering of her grade decision. Rather she was told the change to her grade to the lower grade, was an established requirement, even though no citation was given to Plaintiff, to support that assertion, as is required.

30.     Ms. Young, was also told that her salary would not be affected, and that the downgrade was NOT due to any adverse disciplinary action. But her salary was affected, the grade for the training job, was in reality a disguised downgrade, because, as Secretary GS-9 Plaintiff salary was $35,704, while as Associate Account Executive (Trainee) she earned GS-5 $37, 016.

31.     The difference between the pay amounts for the former and new positions' grades, does not reveal the actual disparity between Plaintiff's GS-9 position as Secretary, and the GS-5 Associate Account Executive (Trainee) that was supposed to be an "upward mobility" position – which gave Ms. Young a higher responsibility, and more work, but little pay, because her superiors actually downgraded her, in a way, that denied her benefits and privileges of that position. Plaintiff also believes that the downgrade and its effect, was part of her superiors' design to set her up to fail.

32.     Plaintiff also discussed the downgrade with another human resource professional from HUD, who told her that her superiors who selected her for the position, should have at least, started her, at the GS-9 grade level, because of her top performance and the contributions she had made to the agency, by performing high-level work above and beyond her routine secretarial duties and responsibilities.

33.     Ms. Young had no other choice but to accept the downgrade "Associate Account Executive Trainee - GS-5" position, which she believed, as it was stated, will help her move upward, the career ladder, as the new position will give the high-level, substantive work that she has been doing, above and beyond her routine secretarial duties, the kind of visibility, and recognition that they deserved. But as she soon realized, that was not to be.

34.     Ms. Young, was told multiple times, and encouraged by Michael Najjum ("Najjum"), Senior Vice President of Finance, (white male) and Theodore Foster ("Foster"), Senior Vice President of the Office of Customer Service, (white male) that she was "an up-and-coming emerging leader" at the agency. However, behind the scenes, decisions were intentionally and actually made, to hinder her progress, because of her race, color, age, and sex, and decisions were made as reprised, for her prior exercise of her EEO rights, and activities.

35.     In December 1999, as an Associate Account Executive GS-5, Ms. Young was nominated, and presented with the Special Act/Service Award by Ginnie Mae Senior Executive leadership.

36.     For the year 1999 – 2000, Performance Appraisal, Ms. Young earned an overall rating of "Outstanding" – according to agency's highest rating scale.

37.     The "Upward Mobility Program" required the agency to pay for all of Ms. Young's college education to earn a higher education degree, any professional development, and

leadership training. However, because agency did not fulfill that part of its obligation, Plaintiff ended up paying out of pocket, for most if not all of her higher education.

Proven History of Hard Work and Excellence

38.    Ginnie Mae did not hold up its side of the commitment even though Ms. Young, was excelling in her job performance, and received merit promotions from grade GS-5 in 2000 to GS-12 in 2002. And was promoted in 2003, from grade GS-12 to GS-13.

39.    For the performance appraisal year of 2001 – 2002, in grade GS-11, Ms. Young earned an overall Outstanding rating. She excelled in all performance standards critical elements of: (1) Responsiveness to the Ginnie Mae Issuer Community regarding transactions, monitoring/counterparty risk management, portfolio analysis, and more; (2) Team Membership; (3) Effective Leadership to Teams; and (4) Supports Continuous Improvement.

40.    Also, in 2002, as shown on her SF50, there was "Notification of Personnel Action" effective December 29, 2002, showing that Ms. Young, successfully met full performance rating level, as an Associate Account Executive Trainee GS-11; as a result, her job title changed to Mortgage Banking Analyst; and she was also meritoriously promoted to GS-12.

41.    At some point in 2002, the Office of Customer Service Issuer Management was renamed to the Office of Mortgage-Backed Securities (OMBS"). In the same year, a new division was created called the Risk Monitoring Division ("RMD"), within the OMBS. The RMD director was Bryan Hooper ("Hooper"), a Caucasian white male.

42.    Mr. Foster ("Foster"), Ms. Young's second-line supervisor, encouraged her to join the RMD, because of her advanced analytical skills. At that time, Ms. Young was already leading multiple mission critical and major national projects, and training other Ginnie Mae employees on the basic mortgage servicing waterfall analysis, workflow processes, and how the overall

investor program worked. In addition, Ms. Young was the lead issuer default analyst, to default issuers when they violated Ginnie Mae regulations.  Plaintiff, later join the RMD, as her second-line supervisor, Foster encouraged her to do.

43.    Ms. Young's second-line supervisor, Foster, instructed her to "be more aggressive when onsite at the lender institutions with the legal team" even after Plaintiff tried to persuade him that being aggressive was not necessary, because the companies were family-owned businesses.

44.    Ms. Young enjoyed her work with secondary markets, and so, worked diligently to maintain her integrity, and to be credible in exercising her duties at RMD.  With that, and her superb work ethic, she expanded her professional network.

45.    The Risk Monitoring Division comprised of five (5) employees:  Hooper, the director, a Caucasian white male; Paul St. Laurent ("St. Laurent") a Caucasian white male; Helen E. Faunce ("Faunce"), a Caucasian white female, and Justin Burch ("Burch"), a Caucasian white male, and Ms. Young - the only Black African-American employee in the division, who was also a female.

46.    For the performance appraisal year of 2002 – 2003, Ms. Young believes she was unfairly issued an overall rating of "Highly Successful" by Hooper, while her white colleagues who had less responsibilities than her, were given higher ratings than her.

47.    Before issuing Plaintiff his final evaluation rating, Hooper did not have the mid-year discussion that was required, under HUD's Performance Management Plan Policy and Procedures, with Plaintiff, to discuss how she needed to improve or elevate her performance rating, if he felt that was necessary for her to get a higher rating. Plaintiff had five (5) critical elements equivalent to senior executive performance standards.

48.    Ms. Young, repeatedly requested from Hooper, supporting documentation he used to rate her, and how each critical element was measured so she can better understand why she was

issued the "Highly Successful" overall rating, and not a rating higher than that, which she felt she deserved.

49.     However, Mr. Hooper stonewalled Plaintiff. She received no response, no evidence or follow-up to support the overall rating decision from Hooper. In the end, Ms. Young gave up and reluctantly signed the performance appraisal, after Hooper told her, that signing the performance appraisal, was simply to acknowledge receipt of her rating.

50.     At the time, Ms. Young, was on the front-line leading major critical investor and agency-level projects to ensure business continuity, and assisting Ginnie Mae, with defaults, and training HUD legal, and senior executive officials, on default procedures, and program requirements in the Ginnie Mae Guide.

51.     About November 2003, Ms. Young applied, competed for, and was selected for the position of Mortgage Banking Analyst GS-13 in the RMD, and was promoted from GS-12 to GS-13. That promotion became effective on December 28, 2003.

52.     Ms. Young was intermittently appointed the "acting director" of the Risk Monitoring Division, and was leading Ginnie Mae issuer defaults typically performed by GS-14s and GS-15s. She was also, nominated to oversee, supervise, and lead other initiatives, including at one point, as Freedom of Information Act ("FOIA") officer – Plaintiff was "The" FOIA Officer for the United States Federal Government Ginnie Mae securities.

**After reaching GS-13 in 2003 Continuous Harassment/Hostility and Discrimination Halted Ms. Young's Career at HUD**

53.     Over a period of ten years, between December 2003, to April 2013, Ms. Young's career stagnated, as she remained in grade GS-13 in the position of Mortgage Banking Analyst at Ginnie Mae, for ten (10) years, without any promotion, even though she informally had supervisory responsibilities for government contracts and teams, as a Government Technical

Representative ("GTR"), examining lender operations and creditworthiness, working on the Presidential Management Agenda, and leading agency level initiatives.

54.    Approximately between 2003 - 2004, Ms. Young became a target, and the subject of intimidation, harassment, bullying, disparate treatment, and a hostile work environment. She started receiving handwritten notes threatening physical harm to her person. But she did not know the reason she was so selected and targeted.

55.    After verbally reporting several incidents to her first-line supervisor, Hooper, and her second-line supervisor Foster, she began to feel less physically and psychologically safe at work, because after reporting to them, no action was taken by management to stop the hostility and harassment against her. As a result, the intimidation, harassment and hostility towards her, continued over a long-term, that forced her to resign a leave the agency in 2013.

56.    About 2005 – 2006, a team meeting was scheduled, where her second-line supervisor Foster, was required to discuss upcoming work, related to representatives and warrants, that presented a critical impact on how the Ginnie Mae programs, were being administered and managed. Present at the meeting were individuals who were in grades higher than Plaintiff. So, she felt honored and was excited about being a part of the effort to help with business process improvement.

57.    However, her excitement and good feeling quickly evaporated, when Ingrid Ripley ("Ripley") a Latino female, stated: "Karmen you will never get a GS-14 at Ginnie Mae. That's just the way it is here." This statement was made towards the end of the meeting in the presence of attendees that included Foster, Hooper, Burch, St. Laurent, and Thomas Kumi ("Kumi") a Black African-American male of African descent. Ripley. Burch, St. Laurent, and Thomas Kumi had close friendly relationships, with Plaintiff's first line supervisor Hooper, and second-line

supervisor, Foster. Ripley's comment was intimidating and hostile, yet no one reprimanded her about it during the meeting or later.

58.    Additionally, Ms. Young, experienced intentional exclusion that was ongoing, masterminded, and coordinated by Ripley, the influencer and invoker of "Mean Girl" tactics, who rallied other female coworkers in the office, to isolate and target me with hostility. Their acts were intentional, covert exclusion, that made Plaintiff feel minimized, and that she did not belong, even at times when it looks like she was included.

59.    For example, Ripley and other females coordinated a holiday gift exchange that was unfair, biased, rigged and fixed. The names were drawn prior to the gift exchange day. On the exchange day, Plaintiff received a clearly, visibly used item, that she could not use, while everyone else received nice gifts that were brand new and usable, including the one she herself bought, that was given to the name she drew earlier. After unwrapping the gift, while standing with the group of female coworkers, a pin drop could be heard in the silence and their non-verbal emotional queues and body languages explained that the whole thing was rigged so that Plaintiff got the used gift, and that she was not accepted – it was all planned by Ripley and her cohorts.

60.    Ripley is now the Executive Director of the Single-Family Housing Guaranteed Loan Program for Rural Housing Service at the U.S. Department of Agriculture.

61.    Ms. Young was intimidated, stereotyped, harassed and bullied with handwritten notes, as that were placed inside her workspace at various locations that stated, "Cocaine Dependency." Ms. Young has never in been a drug user or engaged in such activities.

62.    Plaintiff felt that everyone was against her for reasons unbeknownst to her. She was fearful that the false rumor and highly offensive and intolerable conduct of epithets would ruin her professional career.

63.    As a result, Ms. Young wrote and sent an email to her first-line supervisor Hooper and reported the incident to him. She also reported the incident to HUD's security office. Despite reporting the incident to agency and management, she received no reply from her direct supervisor Hooper, and no action was taken by him.

64.    Ms. Young then initiated a meeting with Hooper, and during that meeting, verbally requested to be moved to another office, but Hooper declined her request and told her not to put it in writing or consult with other managers.

65.    The above incident was followed by another targeted event of intimidation, harassment, and hostility directly towards Plaintiff, when a colleague or colleagues in the same hostile alliance group vandalized her office cabinet lock, and prevented her from gaining access to her work materials.

66.    Ms. Young reported the incident to the new director of the Risk Monitoring Division St. Laurent. Nothing was said, and the matter was not addressed to staff in any meetings that followed. By this time, her colleagues at Ginnie Mae and HUD headquarters, were mockingly addressing her as "Ms. Ginnie Mae."

67    In 2005, Ms. Young was not approved to participate in the 2005 HUD "Emerging Leaders Program", despite her long tenure at the agency, and as the latest "Upward Mobility" employee.

68.    Ms. Young felt that in not selecting her to participate in the Emerging Leaders Program, agency and its management discriminated against her based on her race and color.

69.    Plaintiff continued to be subjected to disparate treatment, hostility, and bullying, that created an intolerable, offensive, and persistent hostile work environment, and deliberate, mercurially crafty strategies intended to stagnate Plaintiff's professional development.

70.     Management used individuals within Ms. Young's protected class as catalysts to keep their knees on her neck and weaponized their authority by intentionally creating an internal Ginnie Mae vetting process that required inquiries about application status be addressed to Cheryl Owens ("Owens"), Black African-American female, Senior Vice President of Management Operations, rather than the point of contact Wanda Campbell, or Linda Oliver as indicated on page 2 of the job announcement.

71.     The Emerging Leaders Program was a competencies-based program with a leadership-based curriculum for high performing employees who were GS-11 through GS-13 to engage and develop them, build a diverse and motivated pipeline of future leaders to promote internally, and fill manager turnover.

72.     Ginnie Mae was given one (1) trainee slot. Management reported two (2) applications were submitted, however there is no indication that any of the two were her application.

73.     Before Ms. Young applied for the Emerging Leaders Program, she consulted with her second-line supervisor Foster, who informed her that more than one candidate could possibly be selected from within one organization or program office. So, Plaintiff submitted her application.

74.     After she applied, Plaintiff asked her first-line supervisor Hooper, and her second-line supervisor Foster, several times, about the status of her application.  The responses she received was: "You just have to wait and see."

75.     Ms. Young was referred by Hooper, and Foster, to meet with Owens who was not in her chain of command, but she followed their instruction to ask Owens about the status of her application.

76.    Around October 10, 2006, Ms. Young met with Owens who told her that, "three to four months ago, Ginnie Mae management reviewed the applications and selected one candidate to move forward." The candidate selected, was Victoria Vargas ("Vargas"), white Latino female.

77.    On that same day, Plaintiff in a written contemporaneous memo, memorialized for the record, and annotated what occurred in her meeting with Owens.

78.    Plaintiff felt that her professional career path was being threatened, because others who were new comers to the agency, like Vargas, were afforded opportunities that progressed their careers, but Plaintiff who has been there longer – since 1995, and was promoted to GS-13 in 2003, was not. Vargas, who is younger than Plaintiff, joined Ginnie Mae in 2006 at grade GS-13. Vargas is now a GS-15, Director, Program Administration Division Office of Securities Operation.

79.    In 2006, Plaintiff began reporting to her former peer/colleague, St. Laurent, who became the new director of the RMD. At that time, Plaintiff continued to be the only Black African-American and female in that division. Time after time, even with new directors, management continued to intimidate, bully, and harass her.

80.    Like Owens, other management officials, continued to deploy crafty bullying strategies, by using individuals within Plaintiff's protected class as a pawn, to target her, so as to avoid holding accountable, those who instructed her to avoid talking to, or contacting colleagues, and verbally reprimanded her for doing so.

81.    Ms. Young, was always walking on eggshells. On a certain occasion, Ms. Young politely and professionally, asked her time keeper, Leonora Noel-Bizzell ("Noel-Bizzell"), Black/African American female of Guyana ethnicity, with a lighter skinned-complexion, to correct an error on her [Plaintiff's] timecard. That simple request, to Noel-Bizzell, turned to a reprimand.

82.     After asking Noel-Bizzell, her time keeper, to correct an error her timecards, to her shock

and surprise, Ms. Young was summoned by her second-line supervisor, Foster, to his office. In

his office, Foster informed Plaintiff that Noel-Bizzell in anger, complained to him that she [Noel-

Bizzell] could not work with Plaintiff.

83.     Foster, then, verbally reprimanded Ms. Young, and instructed her not to approach or

speak to Noel-Bizzell or any of her peers within the office, anymore about any problems she has.

Foster further accused Plaintiff of fostering a hostile work environment by a culture of negativity.

84.     Intimidated, bullied, and humiliated for no reason, Ms. Young could not apprehend what

was happening, as she could not fathom the cause of such hostility from Foster.

85.     In summary, about July 7, 2006, Noel-Bizzell processed an inaccurate time report for Ms.

Young, and Ms. Young asked her to correct the error on her timecard, and on July 26, 2006,

Noel-Bizzell made the correction. At the end of July, Ms. Young, was told by Foster that

LaKevia Waller ("Waller"), Black African-American female, would be Plaintiff's new

timekeeper. With that, Plaintiff felt that she was being backed into a corner with this new tactic,

of using employees in her protected class, against her. Plaintiff also felt being set up to fail.

86.     The targeting tactics continued and on November 24, 2006, Ms. Young reported to St.

Laurent, the new director of the RMD, that a coworker other than her timekeeper LaKevia

Waller, hand-delivered her timecard documentation to her without sealing it in an envelope,

thereby exposing, and failing to protect Plaintiff's personal identifiable and private information.

Disclosure of personal information is a violation of timekeeping rules and privacy laws. Ms.

Young's social security number was clearly visible on the document as it was turned upright.

87.     About October 2006, Plaintiff's colleagues and management continued to join in an

alliance against her, even though she violated no agency policy, and did absolutely nothing

wrong to any of those individuals. She continued to be the target for ongoing baseless, and unwarranted verbal reprimands that were never recorded, and no SF50 Notification of Personnel Actions were issued, because there were no legitimate bases for issuing such, as the verbal reprimands, were sheer hostility, aimed to intimidate her, that was intentional, and unlawful, based on unrestrained, insidious and invidious discriminatory animus, because of her race, color, sex, and reprisal for her prior EEO activities.

88.     Ms. Young was also subjected to more ongoing patterns of unprovoked and unwelcome harassment and hostility through physical assaults, by Mr. Burch. Burch had been physically assaulting Ms. Young for weeks, by intentionally, and deliberately walking into Ms. Young and hitting her with his shoulder or elbow by her side, or her backside, wherever Plaintiff was standing at different times in the office, and when no one else was around to witness what he did.

89.     Ms. Young asked Burch to stop assaulting her, by brushing up against her person. However, Burch's response was that, "…issues between you [Young] and Leonora [Noel-Bizzell] affects me and I must act accordingly and not speak to you." Burch's unacceptable and unwelcome behavior continued, and he was never reprimanded.

90.     Ms. Young reported Burch's assaults to Foster, and that they were taking place almost daily. During a standard weekly staff meeting, management did absolutely nothing to defuse Plaintiff's reported hostile work environment she was subjected to, even after she reported physical assaults from Burch against her, to them. Ms. Young reported the incidents to Foster, who mentioned nothing about the rules of behavior while in the office at that meeting. Instead, the staff meeting centered on warning attendees not to play music inside their workstations.

91.     Prior to that staff meeting, Ms. Young was verbally reprimanded by Foster, for playing music in her work cubicle. For that incident, Foster told Plaintiff that complaints were made by her colleagues who singled her out. However, Foster did not state the names of those colleagues.

92.     The following day after the meeting, Plaintiff emailed Foster, noting that the physical assault she experienced in the office, which she reported to him, was not mentioned at the staff meeting. Plaintiff sent Foster the note, because she did not know who else to report the assault to.

93.     When Ms. Young saw Foster in the main hallway after the staff meeting, she literally begged him to tell her colleagues to stop ganging against her, and assaulting her. Ms. Young informed Foster that Burch was threatening her, that she felt unsafe, and unable to concentrate on being productive at work. Despite begging Forster, Ms. Young received an email from Foster immediately following the staff meeting, that said nothing about the physical assault she complained to him about.

94.     Through late 2006, patterns of ill-treatment against Ms. Young, in the workplace continued, and apparently was supported by management when she was left out of an office-wide distribution of that year's holiday leave calendar. The person distributing the work calendars to all staff, was Noel-Bizzell. Noel-Bizzell gave copies to Ms. Young's colleagues, but deliberately and intentionally left her out.

95.     First, the calendar was critical for understanding office coverage and available human resources for assistance with projects. Second, Ms. Young, had reported that she could not get assistance in updating Issuer Review Board documentation that required critical signatures from agency legal counsel in the Office of the General Counsel. Third, she reported to management that she did not receive the employee distribution list, critical for project updates, that Noel-Bizzell updated and distributed to all other staff members, except Plaintiff. As a result, Ms.

Young had to rely on assistance from other teammates outside of her office in order to make sure that she had the necessary and updated information. For all her reported needs, Ms. Young received no known responses from management. Helpless, Plaintiff had no other choice but to continue reporting instances of isolation, harassment, hostile work environment, threats, and more, to management in writing in an effort to protect herself.

96.    Through 2007, Ms. Young continued to be subjected to patterns of intentional ill-treatment, unwelcome conduct, and bullying (to list a few) in the workplace, which management apparently continued to support by their acquiescence, and lack of investigation or any reprimand of the culprits.

97.    To add insult to injury, other employees who were not assigned to Ms. Young's office seemed to join the conspiracy and alliance against her, including, employees in her protected class, who her superiors used, as a shield to further ruin Plaintiff's professional reputation. In concert, they invoked great fear in Plaintiff, as they conspired to set her up to fail.

98.    On April 2, 2007, Ms. Young felt she was being set-up when Merlene Hawkins ("Hawkins"), a Black African American female, of African ethnicity, who was a Management Analyst in a different department, from Plaintiff's, asked Plaintiff to stop by her office to discuss FOIA matters. Their discussion centered on Hawkins being interested in doing FOIA work to expand her experience, and Ms. Young asking if she would like her [Young] to train her [Hawkins]. Hawkins accepted Young's offer to train her if she was interested, and the both agreed that Hawkins should stop at Ms. Young's cubicle whenever she has any FOIA questions.

99.    About mid-April of 2007, when Hawkins arrived at Plaintiff's workstation, Plaintiff handed Hawkins a printed FOIA request. Hawkins then loudly argued and accused Plaintiff of commanding, and delegating FOIA work to her. That was false, because at the time,

Hawkins was voluntarily learning to work on FOIA, and Plaintiff, who at that time, was the FOIA Officer, was merely showing Hawkins, aspects of the FOIA program so that she could decide whether or not she wanted to assume that collateral duty position.

100.    In 2006, at Hawkin's request, Ms. Young had encouraged and recommended Hawkins to be the new FOIA Officer for Ginnie Mae, i.e., to take over from Ms. Young. Ms. Hawkins will later be appointed as the new FOIA Officer, for Ginnie Mae, who took over from Plaintiff, sometime in 2008.

101.    Ms. Young reported that issue up to her chain of command, including Michael Frenz ("Frenz"), the new Executive Vice President of Ginnie Mae, and a white Caucasian male, to make him aware of the hostile work environment and the horrible, tactics of culturally pitting minority employees against each other, for no objective reason. Plaintiff also met with Foster, and Frenz separately to request to be moved to another office, and discuss initial engagement. I received no response or help to defuse the situation other than Owens inserting herself and issued a verbal reprimand.

102.    About early May 2007, I continued to encounter a persisting intentionally deliberate hostile work environment, harassment, threats of physical violence behaviors, and being singled out that continued to be supported by management that was brought on by additional colleagues who joined in an alliance against me when I heard coworkers standing on the other side of my work cubicle speaking loudly and stated, "I think someone should jump her." I only heard voices and do not know who these individuals were. I received no support or response from management after I sent the email to St. Laurent.

103.    On May 18, 2007, Ms. Young was given a Memorandum of Caution by Foster, regarding the incident with Hawkins, which was totally unfair, and a targeted set-up, because of her race

and darker complexion. When Plaintiff met with Foster, she felt singled out for unlawful microinsults, that was directed by others against her.

104.    Ms. Young was the only person going through these issues for doing absolutely nothing wrong. In that meeting he stated, "You don't fit in," and "I think it's best if you find somewhere else to go." Your coworkers no longer want you here…it's best that you leave." On the same day, Plaintiff submitted a rebuttal to refute the allegations. On April 11, 2007, she received an email from Owens that was addressed to the entire organization. Owens was never in my chain of command. Also in May 2007, she continued to be the target of ongoing harassment and hostile work environment behaviors tolerated by Ginnie Mae management when coworkers in the clique complained to management about me humming (see Exhibits 28-33). She found it near impossible to be productive at work and go to work. To take this further, Dougherty kept paper files on Ginnie Mae employees in folders located inside of her office cabinet.

**Discriminatory Adverse Actions and Treatment**

105.    From January 2006 – September 2006, Ms. Young perceived, and believed that she was the subject of continued discrimination and disparate treatment by management, when her coworkers in the Risk Monitoring Division, were appointed as acting directors more frequently than she ever was appointed (Ex. 36-44).

106.    For performance year February 2006 – September 2006, Ms. Young was discriminated against based on her race, color, and sex, when she received an annual performance rating, that was lower than all of her Caucasian white female, and male coworkers in the Risk Monitoring Division. The higher appraisal rating given to my white colleagues, gave them a better chance at getting promoted, reassigned, and afforded a better professional future overall, than Plaintiff. My

coworkers within the RMD told other coworkers that they had good relationships with their overall raters.

107.    Ms. Young's white Caucasian coworkers, received higher performance ratings for performing less work, because management was clearly trying to promote their career, but Plaintiff was treated differently, and downgraded, even though for years, Ms. Young worked on complex projects, leading high-profile initiatives, performing more quality work than her white coworkers, and received overall performance ratings above fully successful.

108.    Management blatantly discriminated against Plaintiff by rating her lower than her coworkers, despite her having more responsibilities, and had been working on the front-line leading many projects equivalent to grades GS-14 and GS-15 to achieve agency goals, and had received a superior service cash award in April 2007.

109.    Furthermore, during the same timeframe, about July 2006, Ginnie Mae advertised a vacancy for Senior Account Executive/Senior Mortgage Banking Analyst, 1101, GS-14 position (announcement number RE-MSH-2006-0241z). Ms. Young applied for that position, because she knew that she was best qualified for it. After she applied, her name was listed on the selection roster. However, in September 2006, management made no selection, and cancelled the vacancy, instead of selecting Plaintiff who was best qualified to be promoted to that position.

110.    For performance year October 2006 – September 2007, Ms. Young believed she was the subject of retaliation, because of her prior EEO activities, and continued discrimination against her, based on her race, color, and sex, when she received another lower overall performance rating than her Caucasian white colleagues in the RMD, who performed less work assignments, in scope and volume, and yet, were rated better, and stood a better chance at enhancing their careers and getting promoted in the future, while Plaintiff was left with no such chance.

111.    After the October 2006 – September 2007 lower overall performance rating, Ms. Young challenged the critical elements and overall rating through her union grievance process, with supporting evidence to substantiate her claim that she merited an "outstanding" performance rating. In response, Management changed only critical element 1 rating, from "excellent" to "outstanding" but refused to change the overall rating to outstanding. Because the overall rating she was given, was unfair, biased, blatantly discriminatory, and was contradicted by clear evidence of her true performance, Plaintiff refused to sign it.

112.    As Management was rating them higher than Ms. Young, while giving her an overall lower rating, for performing the same or similar work, the intended consequence and result, was to make Plaintiff's white Caucasian coworkers look more superior in performance than her.

113.    Burch received an overall rating of Outstanding for performing only one project and less work (Ex. 46-47) when compared to the volume and level of complexity related to the work Plaintiff was assigned, and which she performed.

114.    Ms. Young experienced constant undeniable put-downs from Burch, who in front of another coworker, a Black African-American female, who was at a lower grade, in the Multifamily Division, told Plaintiff that: "When opportunities come up, they would choose me over you any day, because I fit the bill."

115.    Ms. Young was approached by Burch, and he frequently and physically assaulting Plaintiff, by intentionally brushing up against her, throwing his shoulder at her, when there was more than sufficient space for him to pass through, when Plaintiff was either in the hallway, the office, or in the breakroom.

116.    Plaintiff had to listen to Burch's racial statements, "I will be chosen over you Blacks anytime." Ms. Young reported this behavior to management. Yet, Burch was never reprimanded

and nothing happened to improve or rid the work environment from microaggressions, hostility, fear, and harassment.

117.    Ms. Young was in fear of continuously asking Burch to stop his assault, harassment and hostility against her, because Burch and some other employees with malice, were giving false, and inaccurate statements to management, about any events or incidents that concerned Plaintiff, and those Plaintiff had reported to her superiors. Yet, her superiors who never investigated any of her complaints, believed those false accounts over hers.

118.    Ms. Young worked her way up from grade level GS-5 to GS-13, at Ginnie Mae. When Burch started his employment at Ginnie Mae, he was at a higher grade and was brought onboard straight off the street, with none or minimum prior experience, of what the agency does.

119.    Ms. Young was tormented, bullied and abused by Burch, even after verbally, and repeatedly reporting to her superiors, about his unwelcome and unacceptable behaviors, which included, Burch daily sharpening a lead pencil and throwing it over the six-foot modular petition, that hit Plaintiff multiple times.

120.    Zachary Skochko ("Skochko"), a white Caucasian male, witnessed Burch's assaulting behavior of throwing flying pencils over the cubicle partition, aimed at Plaintiff's workstation. Skochko's cubicle was directly across from Plaintiff's for at least 3-4 years. Skochko witnessed some instances of a intimidation, harassment and hostility against Plaintiff. For example, he witnessed when Ms. Young's second-line supervisor, Foster, places his very hot cup of coffee above Plaintiff's head, on a 4-inch cubicle ledge of her cubicle, at a location right over Plaintiff's working space. Skochko turned and said to Plaintiff: "that looks like an intentional act of intimidation."

121.    Although Skochko was a Multi-Family Analyst, he and Ms. Young, communicated about an array of topics related to the housing finance and mortgage banking industry, regulatory requirements, and lender programs. Skochko and Plaintiff also communicated about their personal hobbies. The passion they both shared most was fishing. Skochko told Plaintiff about one of his family's fishing trips to Alaska to catch salmon and shared photos of how large the ones they caught were, while standing on a boat. Although Skochko was Plaintiff's peer and a GS-13, in the Multifamily Division, he was familiar with and regularly complimented Plaintiff, on her superior performance, and sought her as a trusted advisor, who had years of experience, and knowledge of the Ginnie Mae program.

122.    In 2011, Ms. Young shared with Skochko that she applied for and was not selected for either the Counterpart Risk Analyst vacancy or Operations Risk vacancy that was announced. He explained to Ms. Young, that she may file either a grievance or EEO complaint because, in his words, "the Counterparty Risk Office was a duplicate of the Risk Monitoring Division, which was already performing the work, all management had to do was add more employees and elevate the scope, and that Kinney was justifying bringing Fannie Mae and Freddie Mac folks to Ginnie Mae."

123.    In 2008, Ms. Young continued to experience disparate treatment, unfairness. At the same time, her colleagues who she worked with, were treated better and enjoyed favoritism from our superiors and management. Ms. Young received a memorandum issued by the President of Ginnie Mae, that prohibited the approval of any leave between December 18, 2008- January 2, 2009, for employees working on certain government contract work, that was critical for operations. However, management allowed and approved leave submitted by Faunce. One of the largest contracts listed in the memorandum, was the Single-Family Master Subservicer ("SFMSS

Contract"), that Faunce, and Ms. Young, were Government Technical Monitors (GTMs), which involves a critical core management function of Ginnie Mae operations, whenever an issuer defaulted.

124.    The December 2008 Office Holiday Leave Calendar indicated that Faunce would be out of the office on vacation from December 16, 2008, to at least January 3, 2009. That, not only meant that Plaintiff had to do her job and that of Faunce, it also doubled Plaintiff's workload, because she was also the responsible Chairperson, for moving procurement forward. Management ignored the fact that Faunce's leave, clearly violated the President of Ginnie Mae's no leave order.

125.    In November, Ms. Young submitted a sick leave request, for December 11, 2008, and it was approved.  On her return to work, she informed her first and second-line supervisors - Hooper, and Foster respectively, that she needed another sick leave for a day or two, and gave them the dates, which unfortunately, fell within the timeframe the memorandum prevented leave approval. Management denied her later sick leave request, based on the December 2008 memorandum.

126.    Ms. Young responded, and accused her superiors of applying an intentional double standard that was discriminatorily unfair to her, by applying the memorandum prohibition against her, and not against Faunce, because Faunce's vacation leave also fell with the memorandum dates, and for longer periods, but was approved. As such, she asked that her leave denial be reversed, and be allowed to take the 2 days off. Plaintiff received no response.

127.    On November 19, 2008, Ms. Young sent an email to Joseph Murin ("Murin"), President of Ginnie Mae, to make him aware of the situation, and for transparency on the SFMSS Contract. The Federal Government offices were closed on December 25 – 26, 2008.

128.    The disparate treatment against Ms. Young, continued, and in late 2008, Ms. Young applied for a position at the Executive Office of the President of the United States, to lead FOIA for the new administration. St. Laurent gave his approval by signing the Detailee form and that he would speak with Ledbetter directly, but "…your presence is not required. It seems simple enough." After several follow-up attempts to get the decision status, Ms. Young received no second-line approval from the Senior Vice President, Office of Mortgage-Backed Securities, Stephen Ledbetter ("Ledbetter") a white Caucasian male).

129.    Over a 6-7week period, Ms. Young followed up with St. Laurent, and Ledbetter. Ledbetter was referring her to St. Laurent, and St. Laurent was referring her back to Ledbetter. This back and forth kept on for over 6-7week weeks. Then, St. Laurent referred me to Owens, who was not in Ms. Young's chain of command, who stated: "We know nothing about this opportunity." Late December 2008, Owens returned Plaintiff's forms unsigned by Ledbetter who became Plaintiff's second-line supervisor in 2008, after Foster - in an envelope noting, "I never dealt with a process like this before." The forms were eventually signed, but late after the time frame required. So, again, Plaintiff missed that opportunity which she believes the delay was intentionally created by management to prevent her from getting that high-level opportunity. However, her coworker, Elizabeth Faunce, a white was afforded the opportunity for professional growth and development in 2010, when she was assigned to finance.

130.    Sometime between 2006 – 2008, Owens had asked Ms. Young to assist her with understanding the Ginnie Mae program, and writing excerpts, for her application to become certified OPM Senior Executive Service ("SES"). Plaintiff obliged and was happy to assist, because she liked doing work that relates to secondary markets. Over the course of several months, Plaintiff taught Owens, about the Ginnie Mae mortgage-backed securities program,

which comprised of lender requirements; credit risk analysis; mortgage waterfall analysis of Federal Housing; Administration; Veterans Affairs; and Rural Development government-insured mortgages, that served as collateral for securitization. In addition, Plaintiff taught Owens about investor relations, how securities trade, and responsibilities of Merrill Lynch, Goldman Sachs and other such brokers.

131.    Despite all her hard work and high-level performance, Ms. Young was discriminatorily and unfairly issued an overall rating of "Excellent" by Ledbetter for performance appraisal year 2008 – 2009, while her white Caucasian coworkers received higher performance ratings.

132.    In early 2009, Ms. Young was handpicked by Murin, President of Ginnie Mae, and Steve Preston ("Preston") Secretary of HUD, who were both white Caucasian males, to lead Ginnie Mae's Special Servicer Due Diligence Reviews (Impact 2000 Agency Initiative), in response to the country's 2008-2010 financial crisis.

133.    The Special Servicer Due Diligence Reviews project, was directed from Congress, the Executive Office, and related to the Presidential Management Agenda. Joseph Murin impressed on Plaintiff that: "Based on your expertise of the Ginnie Mae program risk monitoring and work ethic, you are the perfect one." Plaintiff accept the task, which entailed traveling across the country to review lender operations, that were applying for Ginnie Mae approval, to be an issuer in the Federal Government's secondary markets programs.

134.    Plaintiff's review efforts helped enhance Ginnie Mae's existing applicant review process, while also working on her other job responsibilities relating to secondary markets' projects, including but not limited to, capital investments, default risk factors, mergers and acquisitions, managing about 159,000 loans on the SFMSS Contract with an estimated aggregate remaining principal balance of $13 billion etc., and briefing leadership on the progress of the review

process. Ms. Young also served as the point of contact for additional documentation, and developed reports of findings and recommendations, that led to senior executive decision-making.

135.    Yet, for performance year October 2009 – September 2010, Ms. Young's hard-work, efforts, and contributions to the agency's mission, was not recognized. While Ledbetter remained her second-line supervisor, the new director Christopher Haspel ("Haspel") a white Caucasian male, issued Ms. Young, an overall rating of "excellent" instead of "outstanding" which she believes she earned given the complex and heavy load of work she was given, that she superbly performed. Once more, she was undermined and subjected to unfair and disparate treatment, when compared with her white Caucasian coworkers, who received higher overall annual performance ratings, for doing less work of less complexity, than her – a deliberate way, white Caucasian management decision makers, were setting up Plaintiff's white coworkers up for career progress.

136.    A new Executive Vice President, Mary K. Kinney ("Kinney") a white Caucasian female, joined the Ginnie Mae executive management team. Kinney previously worked for Fannie Mae. At Kinney's arrival at Ginnie Mae, a new division was created, named Counterparty Risk, and another person from Fannie Mae, Gregory Keith ("Keith"), a white Caucasian male, joined the Ginnie Mae team, and was in charge of the office, as the Chief Risk Officer under the Office of the President at Ginnie Mae.

137.    In June 2010, Steve Ledbetter recommended Ms. Young for appointment to the position of Government Technical Representative ("GTR") for Ginnie Mae's C-OPC-23423 contract. On June 21, 2010, Ginnie Mae's Risk Committee approved Ledbetter's recommendation, and the Office of the Chief Procurement Officer ("OCPO"), issued Ms. Young a GTR appointment letter.

138.    After that GTR appointment, Ms. Young believes she was discriminated against, based on her race, color, and retaliated against, due to her prior EEO activities, when Haspel issued her a Memorandum of Instruction on 9/7/2010, (regarding that GTR appointment), that generally was unnecessarily stern, and also contained certain unnecessary and unwarranted statements that she perceived to be threatening, intimidating, that amounted to harassment and hostility in the workplace:

> "Karmen, if you have any questions about my work expectations in regard to your GTR responsibilities, or concerns about your ability to accomplish your work assignments in this area, I am available to discuss them with you, one-on-one. Please also know that you are a valued employee and I have every expectation that you will be able   to maintain acceptable performance and conduct in regard to this work assignment. However, you should also be aware that if you fail to follow my supervisory instructions, you will be subject to disciplinary action."

139.    Ms. Young also believed that she was being set up to fail, when she was appointed, to the GTR position, to replace Ms. Faunce, because:

(a) judging from the tone and content of Mr. Haspel's Memorandum of Instruction to Ms. Young, dated 9/7/2010.

(b)  Ms. Young was required, and pressured, to sign documents to assume her predecessor Faunce's role as Government Technical Representative for the C-OPC-23423 contract without being briefed on operational status of that contract.

(c) her predecessor to that position, Ms. Faunce, who was a white Caucasian female, did not properly transition the GTR responsibilities to her, before her reassignment to the Office of Finance, and Ms. Young, needed sufficient time to collaborate with Faunce, before transitioning, given that it was crucial for her to comprehend all existing issues relating to that contract.

(d)The modification of the contract for which Ms. Young was appointed to oversee, was to be issued soon, but Ms. Faunce's files including all correspondences regarding that contract, were nowhere to be found, and those files needed to be reconstructed so as to enable Plaintiff know where things stood before her appointment, and her assumption of her new duties. And it was against agency policy, for one employee to access another employee's HUD's mainframe accounts.

(e) It was also crucial that all predecessors' files and emails, including those during Faunce's tenure, be established, because after 30 days, a formal report will be written, submitted, and filed in the GTR folder, and given to the auditor as appropriate, and that report cannot accurately be made without those files or records.

(f) two of the elements, Haspel added to Ms. Young's responsibilities as Ginnie Mae's GTR, (Performance "Elements #4 - Execute Mortgage Instruments", and

"5 – Complete Loan Searches"), were clerical functions, that should be delegated to staff of the 301series, and not to Ms. Young, the Government Technical Representative for the Contract. Mr. Haspel was well about this, yet, added that to Plaintiff's responsibilities as agency's GTR.

(g) Haspel unreasonably and unusually, increased Ms. Young's performance elements to seven (7) of which six (6) were critical, which was not applied to any of her colleagues, and predecessors in that position, and was unheard of, for a non-Federal, Senior Executive Service employee or position, which Ms. Young pointed out to Haspel.

140.    Ms. Young was subjected to continued and perpetuating hostile work environment, when senior executive management and GS-15 professionals, Ms. Sheryl Owen, and Eva White, in the contracting office insulted her, in front of other Ginnie Mae employees, and addressed her with epithets. Owen said: "You ass, better sign the GTR letter"; and White said: "You fuckin ass, don't need to keep harassing people regarding transitioning of the files." All because Ms. Young asked that transitioning of the files from her predecessor Faunce, be properly done so that she could well acquaint herself with the status of the project, she was taking over from Faunce.

141.    Because of the intimidation and hostile attacks, she received, with no support or reprimand from her superiors, Plaintiff submitted her resignation from the GTR position, to Haspel and the contracting officer. However, she later changed her mind, and withdrew her resignation and continued in that position till 2013, when she no longer could continue in such hostile work environment. She sought and accepted outside employment and finally resigned her employment with the HUD.

142.    Ms. Young will later be pressured again, about November 2010, to be the Government Technical Representative, for a different contract - this time, to lead the Single-Family Master Sub-Servicer ("SFMSS") Contract. As she was trying to perform her duties, rabid, unacceptable hostile work environment, that management had allowed to permeate Plaintiff's workplace, continued unabated.

143.    Two of Ms. Young's colleagues plotted to sabotage her work plan progress, when she was setting up travel for senior executives to visit a contractor under her management. The site visit by senior executives, was critical for the management of the government contracts.

144.    Ms. Young submitted the pre-approval travel request to Noel-Bizzell for initial processing. Carolyn Korn, another colleague ("Korn") a white Caucasian female, was responsible for the second phase of processing the executives' travel approval. Korn was a personal best friend of Faunce – Ms. Young's GTR predecessor, whom she was asking proper transitioning of files from.

145.    Both Noel-Bizzell and Korn connived, and falsely stated in emails, that they had not seen the travel approval requests, even though Ms. Young handed the original paperwork directly to Noel-Bizzell. That intentional sabotage, disrupted Ms. Young's work productivity. She had to re-create the pre-approval papers for management to travel, while up against a tight deadline, and had to rush the request through for approval, at the 11th hour.

146.    March 2010, Young was discriminated against based on race, color darker skin complexion, and sex (female) when she was not selected for another promotion, when she applied for the position of Counterparty Risk Analyst GS-14 (vacancy announcement number: H09-MP-290008-MA, Vacancy ID: 290008), in the Counterparty Risk Office. Three (3) males from either Fannie Mae or Freddie Mac or both organizations were selected - Hens C. Etienne

Black African American male; Patrick Hall white Caucasian male; and Paul Theruviparampil a male, of Asian or Pacific Islander descent. All three, were former employees from either Fannie Mae or Freddie Mac or both.

147.    The staffing disposition email stated: "The selecting official has returned the certificate for this position without action. No selection is being made at this time from this certificate. Selection may have been made from another source of candidates for this position."  The disposition email was self-contradictory, confusing, and lacked clarity, perhaps deliberately or intentionally so. As a result of that lack of clarity, Young called the listed HR specialist on the vacancy announcement and got no response.

148.    Hens C. Etienne; Patrick Hall; and Paul Theruviparampil joined the Ginnie Mae staff on May 4, 2010, Counterparty Risk Analyst GS-14, as indicated on the Quarterly Staff Meeting Agenda. Yet again, Young, who had been at Ginnie Mae since 1995, with hands-on knowledge of the agency's risk management operations, was passed over, and three men, from outside, were selected for that promotion.

149.    In 2011, Ginnie Mae advertised an Operational Risk Analyst GS-14 position (vacancy announcement H11-MP-460235-DDM). That position, was to support the Chief Risk Officer, Gregory A. Keith. I believe that I applied, but I cannot remember. Because the advertisement dates very far to the past, I am unable to confirm whether I did in fact apply. However, I recall writing responses to the knowledge, skills, and abilities (KSAs). If I did apply, this is yet another example of non-selection regardless of the position's key requirements that I possessed (see Exhibit 59d). If a selection was made, the selectee was more likely an individual from either Fannie Mae or Freddie Mac was selected, thus demonstrating favoritism and/or cronyism.

150.    In 2010, Ms. Young felt that she had to file an EEO complaint to get resolution. She was targeted and constantly being overlooked for opportunities due to no fault of her own. She loved the work, but the hostile work environment conditions were not of her making. Kinney was listed in the complaint as one of the Responsible Management Officials. Plaintiff applied for many positions at the agency in hopes of remaining in the same line of work. However, the discrimination and hostility towards her became too much for her to bear. She could not stand working at Ginnie Mae anymore and felt that she had to file an EEO complaint on the numerous events that transpired that preventing her from advancing further in her professional career. Numerous times, she previously requested to be reassigned to another office, but nothing happened. Management made intentional efforts to avoid meeting with EEO Counselor. Plaintiff later found out from other Ginnie Mae employees that Kinney had a physical list of employee names that she targeted to terminate their federal employment, and met with the Secretary of HUD and presented the list. One of the employees who told me about the list was Sonya Suarez in Ginnie Mae's technology office.

151.    Approximately May 2011, the new President of Ginnie Mae, Theodore W. Tozer ("Tozer") a white Caucasian male) appointed Plaintiff to a collateral duty assignment as Assistant Secretary of Ginnie Mae. These duties were in addition to my routine responsibilities according to my performance plan working full-time in the Risk Monitoring Division of the Office of Mortgage-Backed Securities (see Exhibit 66). The previous Assistant Secretary was Faunce, who was relieved of this responsibility as management reassigned her to the Office of Finance (see Exhibit 67).

152.    Approximately mid-2011, Michael Drayne (herein "Drayne" Caucasian/white male) became the new director of the Single-Family Division in the Office of Mortgage-Backed

Securities I was confused about who my first-line supervisor however Kinney, from Fannie Mae, remained my third-line supervisor.

153.    For the performance appraisal rating period of October 2010 – September 2011, Plaintiff received an overall rating of Fully Successful. She thought that was retaliatory and intentional. Most of the critical element ratings and the overall rating lower than the previous ratings for performing essentially the same or similar work and working under hostile work conditions for at least a decade, that was issued by Drayne who had just joined Ginnie Mae and Haspel's successor. All the while her other colleagues received higher performance ratings for performing the same or similar work that was less in volume and complexity given that we were all the same grade.

154.    Ms. Young's previous overall ratings had been either outstanding or excellent. For this performance period, my overall rating was further downgraded. Drayne issued me an overall rating of fully successful on December 7, 2011. On December 23, 2011, Kinney initialed that rating as the final rating and as the final rating official.

155.    Management's actions were targeted, deliberate, and triggering. Critical element 3 was rated even lower for improving the Ginnie Mae defaulted-portfolio when all other critical elements are a part of that line of work. The Actual Accomplishment document specifically states, "Ms. Young was successful and met outstanding performance standards" which should complement the actual rating on the cover page. The above shows that management officials were conspiring together against Plaintiff.

156.    Continuously, Ms. Young was given lower ratings, even though she was doing more volume of work, and of greater difficulty, and increased complexity while her co-workers doing the same job but less volume and less complexity received higher ratings than her. And the

hostility towards her was so rabid and unexplained as employees who did not work in her divisions, like Noel-Bizzell, and Cooper-Jones, were able to verbally abuse, harass and intimidate her, without any recourse against them.

157.     While not promoting Plaintiff, she was circulated to various new supervisors, who in turn, overworked her, took the benefit of her expertise, but never acknowledged her contributions, or rewarded her for it. Plaintiff will also watch helplessly, while every new white Caucasian employee, that enters Ginnie Mae, gets promoted, and effortlessly climb the career ladder, but she cannot, even though it was undisputed that she was a hard and excellent, who has established a credible and unblemished professional record and career path in housing finance/mortgage banking systems as a result of demonstrating undeniable leadership and superior counterpart risk work.

158.     Around 2012, the SFMSS Contract was nearing the end of its period of performance. This prompted the re-bidding process for a new acquisition. Plaintiff was nominated as the Chairperson. She had the responsibility of leading this significant project as this re-competition was one of the largest contracted projects at Ginnie Mae due to the substantial dollar amount involved. In that position, she also has to train her team and ensure the follow federal guidelines, and attend conferences with them and guide their work etc.

159.     During the same time, Kinney began harassing Plaintiff in front of other coworkers by coming to her desk, asking how she was doing and then stating, "You don't know how to write. We need to get together and talk about how to improve this skill." Despite the huge responsibility Plaintiff had as the Chairperson for the SFMSS Contract, Kinney did not support Plaintiff, instead, she tried to undermine Plaintiff. So too, were other officials who were somehow

involved in any work Plaintiff was doing – all they did, was find a way to get her to fail, even then, Plaintiff kept shining in her performance of her duties.

160.    Plaintiff also watched while officials like Meaux-Pordzik act or take unethical decisions against federal regulations. At some point, she felt line of Meaux-Pordzik's discussion with her, violated the Federal Acquisition Regulation ("FAR"), the HUD Acquisition Regulation and policy ("HUDAR") and 5 C.F.R. § 2635.101(b)(8) that requires federal employees to act impartially and not give preferential treatment to any private organization or individual. She verbally reported this unethical behavior to the contracting officer and immediately began to seek employment elsewhere, because she felt that she could no longer work at Ginnie Mae any longer under the kind of pressure she was under. No response from the contracting officer was received to warn the new Ginnie Mae management of violating federal government procurement policies. In the meantime, Kinney would come to Plaintiff's desk and appeared excited about her contributions to Ginnie Mae. She stated that she wanted to engage plaintiff more often. But that was questionable and made no sense given her clear and known hostility towards Plaintiff.

161.    Kinney, Grant, and others who were employees from Fannie Mae and Freddie Mac who joined Ginnie Mae, made repeated attempts to work against and discredit Plaintiff's body of knowledge and work at nearly every turn. Their behavior and actions, was also supported by the new management team including Kinney hersel, and nothing was done about it even after Plaintiff to Meaux-Pordzik and Drayne of actions taken against her to undermine her efforts. Said kind of behavior continued even after Plaintiff resigned from Ginnie Mae in 2013.

162.    On or about September 19, 2013, the Ms. Young reported via email and verbally to Michael Drayne in a meeting she initiated, of an incident where Susan Skiles' attempt to provoke physical violence on Young. Skiles ran up into the Young's face (within few inches) when

Plaintiff was at the xerox machine. With both of her fists balled, Susan Skiles stated: "I ain't saving emails to folders on my contracts. Who do you think you are?" "I ain't doing nothing you say to do! I heard you was no good!" This came after Susan Skiles, Caroline Abreu, and Erica Johnson were summoned by Leslie Meaux to Meaux's office. Earlier Ms. Young, in an advisory role, had informed Meaux, about an upcoming contract administration audit, and that it would be best for the staff to save e-communications related to their assigned contracts to create 'folders to help better manage and bring good organization. After, Ms. Young, emailed her then, second-line supervisor, Michael Drayne to report the incident, then scheduled a calendar invite to meet with him. In that meeting all Michael Drayne could say to Ms. Young about her complaint, was: "You better get used to it, because this is the way it is going to be under my management."

163.    Drayne had been asking Plaintiff to meet him in his office impromptu, and more frequently, yet refused to accept any and all of her project status reports that he mandated she submit on a weekly basis. When in his office, he told Plaintiff that she was "making this harder than he expected." Drayne began to articulate and orchestrate the overthrow of the Ginnie Mae internal Procurement Contracts Office headed by White. He told Plaintiff that he wanted her to take over White's role while beginning the process of downgrading Plaintiff's annual performance rating in case Plaintiff did not cooperate. He said to Plaintiff: "There are some unconventional expectations of you in this role because the government procurement process and requirements are too stringent and needs circumventing. All of that work is not necessary. We are counting on you to change it. We are trying to get rid of Eva who is making it too arduous to be successful. We have a new way of doing business. Seeing you in that role and working with us who have come to Ginnie Mae will be rewarding."

164.    On October 21, 2013, Plaintiff submitted her resignation in frustration. She decided to leave Ginnie Mae due to the retaliation, bullying, humiliation, public embarrassment, harassment, being made a scape-goat, and a hostile work environment to list a few.

165.    On or about February 11, 2017, a former Ginnie Mae colleague, James Milhouse (AKA "Dion Milhouse"), asked Young to meet with him. When they met, he informed her that Ms. Mary K. Kinney, the former Executive Vice President and Chief Operating Officer of Ginnie Mae, has intentionally been circulating, false, hostile, defamatory, and degrading rumors that Plaintiff is/was a drug smuggler/dealer before, and after Plaintiff was constrained to voluntarily resign her employment at HUD, and went into private industry, because the discrimination, harassment and hostility she was subjected to, had become unbearable.

166.    Milhouse also informed Ms. Young that they were other current and former Ginnie Mae employees who heard the rumor that Young is a drug smuggler and or dealer, from other, or was told directly by Kinney. And that he and others did not disclose this information to Plaintiff, while she was still working at Ginnie Mae, because they were intimidated and afraid for their jobs, or other form of retaliatory action.

167.    On or about February 17, 2017, after Ms. Young learned that she has not been selected for any of the three vacant positions she applied for, she contacted an attorney. That attorney asked if there was someone who worked with Plaintiff, that she can ask questions about Plaintiff's allegations. Kimberly Adams name and contact was given. To that inquiry, Kimberly Adams, (a current Ginnie Mae employee) informed the attorney that during the aforementioned timeframe in 2017, she [Kimberly] repeatedly told Mary Kinney, "To stop spreading those rumors to everyone at Ginnie Mae about Karmen."

168.    Throughout 2011 - 2013, and after, up to February 17, 2017, Mary K. Kinney, with invidious discriminatory animus, and by spreading dangerously hostile, defamatory, humiliating and degrading false rumors about Plaintiff, created and influenced a rabid, and continuous hostile work environment, that permeated the Ginnie Mae workplace. Ms. Kinney, aided in this unlawful hostile and discriminatory scheme, by her underlings, cohorts, Michael Drayne, and Leslie Meaux, who were also Plaintiff's former superiors, attempted to rate and lower Plaintiff's annual performance rating, outside of the 2013 performance cycle, and, unjustifiably, refused to submit work from Plaintiff, as they were required to do.

169.    Coming from the top, Kinney the Executive Vice President and Chief Operating Officer of Ginnie Mae also set bad examples, that enabled Plaintiff's former peers Caroline Abreu, Erica Johnson, and Susan Skiles from the Office of Issuer & Portfolio Management, to wreak havoc and spark anguish in the workplace, and yet get away with it, because they were cronies of Kinney, Drayne, and Meaux.

170.    Ms. Young believes that Mary Kinney, Michael Drayne, and Leslie Meaux, who knew of her on-the-job practical and specialized experience in private sector, in the same mortgage, finance market industry, influenced selection officials, to select other candidates for job opportunities that she had applied for at HUD and Ginnie Mae.

172.    Mary Kinney's hostile, defamatory, humiliating and degrading false rumors about Plaintiff, that was born out of discriminatory animus, damaged, perhaps, irreparably, Complainant's unblemished professional reputation, at agency during and after she left HUD, to the extent that it will be highly impossible for her to get back to work at the HUD again, no matter how much she would have wanted to.

173.    The effect of Kinney's intentional and knowingly false rumors against Ms. Young, was that Plaintiff's ability to re-enter the federal workforce in 2017, by applying for new advertised, vacant positions at her former office, that she was well qualified for, and be selected for them, was totally sabotaged and compromised.

174.    After resigning in 2013, and as a former public servant, Plaintiff was eligible for reinstatement, as a federal employee through job promotion opportunities, as other colleagues had, or have been able to do, to expand their knowledge and elevate their careers, ensure stable employment, earn reasonable salary, and accrue federal retirement pension. But Kinney and her cohorts, intentionally prevented Ms. Young from doing so, based on her race, color, sex, age, and her prior EEO complaints.

**Race, color and sex**

175.    Ms. Young is a black African-American female, of darker complexion, and Kinney is a white Caucasian female in her late 60s. Ginnie Mae's management, was and still consists of mostly white Caucasians (Plaintiff's former supervisors, especially her first-line and second-line supervisors during her tenure, were all white Caucasian male), and all those who were given better opportunities than Plaintiff, were invariably white Caucasian males or females.

Retaliation:

176.    Prior to Ms. Young resigning from her employment at HUD in 2013, she filed at least two (2) previous EEO complaint(s) and/or grievances against Ginnie Mae management.

177.    Management, including Ms. Kinney, the Executive Vice President and Chief Operating Officer of Ginnie Mae, knew of Ms. Young's previous EEO filings, and have used that information retaliatorily against her, when making employment decisions concerning her, including, but not limited to influencing the decision to interview and select her for the positions

of (1) Executive Vice President & Chief Operating Officer position, ES-110- 00 - Job

Announcement No. ER-16-002; and two (2) Counterpart Risk Analyst positions, GS-1101-14/14

(Job Announcement Nos. 15-HUD-408 and 15-HUD-409P13, respectively.

178.    Announcement No. 15-HUD-408 was for external candidates (not in federal service), and

Announcement No. 15-HUD-409P13, was for in-house employees of Ginnie Mae, and former

Ginnie Mae employees who want to return, and are eligible for reinstatement. Ms. Young was

eligible to apply for both and in fact, did so.

179.    However, Ms. Young, who worked in the "Risk Management Division" as a Mortgage

Banking Analyst, for many years, for Ginnie Mae, was not selected for any of the positions, even

though she was eminently qualified, and had previous hands-on experience in the mortgage,

housing and security industry, and was well versed in the Ginnie May housing and mortgage

policies and program, while working for Ginnie Mae.

180.    More so, Kinney, and other management officials, were well aware, on a day-to-day

basis, of Ms. Young's work experience, and capabilities, because they nominated, and approved

her into carrying series of high-level duties, and responsibilities as described herein, (usually

meant for GS-14, and 15) while kept at GS-13, for ten (10) years, and while denying her of every

promotion opportunity that she had sought during that time period.

181.    Mary Kinney was well aware of Ms. Young's prior EEO activities – a fact that did not sit

well with her, and one she clearly, but implicitly, made Ms. Young know, will be a factor in any

decisions about her future career at Ginnie Mae, during her meeting with Plaintiff on March 15,

2013.

182.    On March 15, 2013, Ms. Young met with Ms. Kinney in her office to discuss Plaintiff's

career goals. During that meeting, Kinney apologized to Young, for demeaning her writing, and

professional skills. Then Kinney proceeded to ask Young about her career goals. Plaintiff told her

that her goals included rising up in rank at Ginnie Mae to the level of EVP (Executive Vice

President). Kinney's response to Young, was direct and unambiguous, as she stated: "...that could

not be achieved" and continued, "is there something else you have in mind...?" Kinney further

added: "...me and other managers here know you filed previous EEO complaints and grievances

and we want to make sure you do not file again." Ms. Young felt intimidated, threatened, and

was afraid.

183.    Kinney will once again, voluntarily, irrelevantly, intentionally, and intimidatingly, raise

the issue of Ms. Young's prior EEO activities. In September 2013, Kinney invited Ms. Young to

meet with her, at the Mandarin Hotel in Washington, DC, to discuss government contracting.

184.    As requested, Ms. Young met her at the "Mandarin." During that meeting, Kinney

intimidatingly stated again:  "I know that you have filed previous EEO complaints and

grievances in the past...I want to make it worth your while, ...I want to know how government

contracting works so that we can free up some money for other things..." Confused and at the

time feeling intimidated and once again threatened, Ms. Young told Kinney that: "...adhering to

government contracting law is by the book and there is no deviation."

185.    Kinney casually and often, made random statements for example, "minorities like blacks

often find themselves in trouble distributing paraphernalia like drugs and other illegal things".

Kenny never hid her bias, disrespect and contempt for minorities, especially black African-

Americans, and not wanting them to progress in federal services at Ginnie Mae.

Executive Vice President & Chief Operating Officer position, ES-1101-00

(Job announcement No. ER-16-002),

186.    The advertised position of Executive Vice President & Chief Operating Officer, ES-1101-00 (Job announcement No. ER-16-002), was given to Nancy Corsiglia, who is a Hispanic female, pale, tan, and lighter skin complexion than Karmen Young, who is a black, African-American, with dark complexion. Nancy has never worked at HUD, or Office of Ginnie Mae. Yet, she was selected above Young, who had worked at HUD/Ginnie Mae, from 1995-2013, and knew the ins and out of the agency's housing programs, and had done the work on a daily basis, for eighteen (18) years. Also, Corsiglia did not have any prior EEO activities record, as Young. Hence, because of Kinney and other management defamatory false rumors against Plaintiff, and hostility, based on her race, and color, Plaintiff was never seriously considered or selected. And her prior EEO activities was retaliatorily used against her, to prevent her from ever getting to work again, at HUD.

187.    For the selection process, management, organized an Executive Resources Board ("ERB"), who selected those interviewed from the "best qualified" list. Although Young was on that list, she was not selected to be interviewed.

188.    The ERB consisted of the following: (1) Barbara Cooper-Jones, Senior Vice President, Office of Enterprise Data & Technology Solutions at Ginnie Mae (2) Deborah Hernandez, Senior Vice President of Administration at Ginnie Mae and (3) Todd Richardson, General Deputy Assistant Secretary, Policy Development and Research at HUD. None of these people worked in the Risk Management Division of Ginnie Mae where Young worked.

189.    During Plaintiff's tenure at HUD/Ginnie Mare, from 1995- 2013, none of these ERB members, worked with Plaintiff on any project, or supervised her in any capacity, and have no idea, about her job experience and capabilities – what she had accomplished at Ginnie Mae, etc. The ERB members had all work in divisions or offices, that totally have nothing to do with

housing mortgage, banking and securities markets, which Young had worked on for years, yet, they were appointed to select and promote applicants, they cannot truly assess, except, that they have been told in advance, who they must select or not select, to go ahead, to the interview level, by the person who was really in charge, and who have had long discriminatory animus against Plaintiff – Gregory Keith, (Kinney's right hand man), who ultimately was the selecting Official.

190.    Gregory Keith also was well aware that Young had filled prior EEO complaints against agency, and invariably was one of the managers, Kinney referred to when she told Plaintiff, "...me and other managers here know you filed previous EEO complaints and grievances and we want to make sure you do not file again."

191.    When Ms. Young met Gregory Keith, Ginnie Mae's Chief Risk Officer, and the selecting official for the Counterparty Risk Analyst GS-1101-14, position, (who did not select Plaintiff), at the Ginnie Mae Summit in September 2015, and asked him about employment opportunities, at Ginnie Mae, as Plaintiff was considering returning back to Ginnie Mae. He stated: "...I will have a GS-7 position you can apply for and that's all that I will have."

192.    Plaintiff left Gennie Mae in 2013 at GS-13 grade level, and Gregory Keith was well aware of that fact. Yet he was telling Plaintiff, that if she were to return to Ginnie Mae, she will have to start at GS-7. When Ms. Young left Gennie Mae in 2013, same Gregory Keith, gave Ms. Young a letter of recommendation, which ironically, Ms. Young submitted with her resume when she applied for the position.

193.    Barbara Cooper-Jones was one of the ERB members, Kinney and Keith handpicked to be on that board and instructed on who to select. But Barbara was also poisoned against Young, as soon as she arrived at Ginnie Mae.

194.    Barbara Cooper-Jones was hired at Ginnie Mare, in November, 2011. She did not work with Young, supervise her, or share an office with Plaintiff. However, around the end of 2011, barely a month of her working at Ginnie Mae, as Young was walking past Cooper-Jones' office, she called Young to come in her office. Young obliged. Cooper-Jones then asking Plaintiff: "How do you like working at Ginnie Mae, and how long have you been working here? Plaintiff answered: "I like the work I was doing in the Risk Management Division, as a Mortgage Banking Analyst, and I have been in that position for about 12 years."

195.    Suddenly, Barbara Cooper-Jones changed the conversation topic, to one that was threatening and intimidating, to Ms. Young, when she said: "I have heard about you not getting along with Noel-Bizzell, … and you will suffer in your professional career as you try to move up if you do not show that you can get along with your colleagues." Shocking, but revealing, what Cooper-Jones said to Young, confirmed that management was intentionally and deliberately defaming her, and using Noel-Bizzell to instigate, against her, and as a pretext and cover up, for their discriminatory animus, and hostility against Plaintiff, in an effort to prevent Young from advancing. Ms. Young had reported issues in the past concerning Noel-Bizzell, where Plaintiff did nothing wrong to her, but management played favorite and did not reprimand her or investigate the issue and stop her hostility against Plaintiff.

**Counterparty Risk Analyst GS-1101-14 (Job Announcement (15-HUD-409P)**

196.    The advertised position of Counterparty Risk Analyst GS-1101-14, was given to Madhavi Ananth, a female, who Plaintiff believed to be an Indian with a lighter skin complexion than Karmen Young. Madhavi Ananth, started working at Ginnie Mae, in June 2014 at GS-13, and was promoted by her selection for this position, to GS-14, within a couple of years, working at HUD/Ginnie Mae. But Ms. Young who was an employee at HUD/Ginnie from 1995-2013,

became a GS-13 in 2003, and for ten (10) years, despite applying for promotion, was never

promoted, and was not selected for this job.

197.    Also, like Ms. Young, Madhavi Ananth, had prior EEO activities as well, but no one at

Ginnie May management, reminded her of her prior EEO filings, or told her not to file again, as

Kinney told Ms. Young, and no one used Madhavi Ananth's EEO prior activities, against her, to

block her from getting the position as Ginnie Mae management did against Ms. Young.

198    Ms. Young believes that she was discriminated against in selecting Madhavi Ananth, for

the Counterparty Risk Analyst GS-1101-14, position, because of her age. At the time she applied

for the position, Ms. Young was in her 50s, while Ananth, was about 31 years of age.

199.    Ms. Young believes that cronyism was also, a factor regarding the selection made

regarding both the Executive Vice President & Chief Operating Officer, ES-1101-00, and the

Counterparty Risk Analyst GS-1101-14, positions, based on prior personal and professional

relationships, and the standard Ginnie Mae established after former Fannie Mae people became

new hires.

200.    At Ginnie Mae, prior personal and professional relationships among senior officials and

other staff, morphed into office tribal membership of sort, or something close to an office version

of a cult, where factual truth, common sense, difference of opinion, or logic no longer exists, in

people's thinking, vocabulary, or how they see things, and if you don't think or act like them, you

just cannot belong.

201.    Ms. Young believes she was referred to the selecting official, for the Executive Vice

President & Chief Operating Officer, ES-1101-00, position, and also listed on the best qualified

roster, but was not contacted for an interview by the interviewing and selecting officials, even

though she possessed not only institutional Ginnie Mae HUD knowledge, but also has more

specialized experience and management experience from the private sector, in the same professional industry.

202.    Plaintiff believes that candidates selected for this position, possessed no institutional knowledge of Ginnie Mae operations and had no prior specialized government experience, as she has, and so should not have been selected over her, but for the fact that Mary Kinney, Gregory Keith, and other management officials at Ginnie Mae who had discriminatory animus against Ms. Young, had intimidated and been very hostile to her during her tenure at Ginnie Mae, had spread false derogatory statements against her, and had warned her not file another EEO complaint, pre-ordained Ms. Young's non-selection for any promotion vacancy at Ginnie Mae.

203.    Ms. Young also believes that while she met the qualifications, required by the Counterparty Risk Analyst GS-1101-14, position, the candidates selected for this position did not meet all required qualifications, and so did not merit selection for the position.

204.    Anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish, loss of enjoyment of life, injury to professional standing, injury to character and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and alienation from personal acquaintances and professional peers.

## V. CLAIMS

### Count I – Violation of Title VII 42 U.S.C. §§ 2000e, et seq.
### Disparate Treatment – Terms and Conditions of Employment
### Based on Race, and Color, Discrimination

205.    The foregoing paragraphs are realleged and incorporated by reference herein.

206.    Plaintiff sought opportunities to be promoted, and reinstated back to her former federal job with Ginnie Mae, by applying for three advertised positions, for promotion and her former management superiors and supervisors denied her those opportunities she sought, even though

she was eminently qualified, because she was subject matter expert on the areas for the position, but selected and promoted similarly situated employees, at GS-13, outside Plaintiff's protected class, who did not have the same level of qualification and specialized experience, or institutional Ginnie Mae HUD knowledge that Plaintiff who was an employee from 1995-2013 has. Plaintiff believes that she was not selected for the positions because of her race, and color,

207.    Defendant and their agent's actions against Plaintiff, was discriminatory, as they robbed her of the terms and conditions of her federal employment. As a direct result, Plaintiff suffered anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish, injury to professional standing, injury to character and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and alienation from personal acquaintances and professional peers.

208.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered and will continue to suffer irreparable harm, pecuniary loses and other damages. Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory damages to make her whole in addition to attorney fees and costs.

### Count II – Violation of Title VII 42 U.S.C. §§ 2000e, et seq.
### Harassment Hostile Work Environment
### Based on Race, and Color Discrimination

209.    The foregoing paragraphs are realleged and incorporated by reference herein.

210.    Ms. Young working for HUD/Ginnie Mae, from 1995 – 2013. During that period, Young suffered several incidents of assault, intimidation, harassment, hostility, that her superiors and management condoned that created a toxic and hostile work environment. Plaintiff reported those incidents to her first- and second-line supervisors at the time, and Ginnie Mae management, but they all failed to respond to these incidents or take any corrective action, or reprimand those who

were responsible for the unlawful acts against her. Among her superiors that she reported to for example, were, Christopher Haspel, Foster, Michael Dwayne, Theordore Foster, were all white Caucasians, who did nothing to stop the abuse against her, because the abuse was also from white Caucasians, and mainly men.

211.    Three of the notable female coworkers, and HUD/Ginnie Mae employees who unprovoked, deliberately and intentionally harassed Plaintiff, and made her working at Ginnie Mae intolerable, were also white Caucasian females. As with their male Caucasian cohorts, Ms. Young's supervisors who she complained to, ignored her complaints and did nothing to correct the situation, or reprimand them.

212.    By committing the foregoing acts of harassment hostile work environment discrimination, against Plaintiff, Defendant violated Title VII.

213.    Said violations were intentionally done to injure Plaintiff in her employment with Ginie Mae, and warrants imposition of damages.

214.    As a direct result of said actions, Plaintiff suffered anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish, injury to professional standing, injury to character and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and alienation from personal acquaintances and professional peers.

215.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer irreparable harm, pecuniary loses and other damages. Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory damages to make him whole in addition to attorney fees and costs.

**Count III – Violation of Title VII 42 U.S.C. §§ 2000e, et seq.**
**Harassment Hostile Work Environment**

## Due to Sex/Gender Discrimination

216.    The foregoing paragraphs are realleged and incorporated by reference herein.

217.    Ms. Young working for HUD/Ginnie Mae, from 1995 – 2013. During that period, Young suffered several incidents of assault, intimidation, harassment, hostility, that her superiors and management condoned that created a toxic and hostile work environment. Plaintiff reported those incidents to her first- and second-line supervisors at the time, and Ginnie Mae management, but they all failed to respond to these incidents or take any corrective action, or reprimand those who were responsible for the unlawful acts against her. Among her superiors that she reported to for example, were, Christopher Haspel, Foster, Michael Dwayne, Theordore Foster, were all white Caucasian males, who did nothing to stop the abuse against her, because the abuse was also from white Caucasians, and mainly males.

218.    By committing the foregoing acts of harassment hostile work environment discrimination, against Plaintiff, Defendant violated Title VII.

219.    Said violations were intentionally done to injure Plaintiff in her employment with Ginie Mae, and warrants imposition of damages.

220.    As a direct result of said actions, Plaintiff suffered anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish, injury to professional standing, injury to character and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and alienation from personal acquaintances and professional peers.

221.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer irreparable harm, pecuniary loses and other damages. Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory damages to make him whole in addition to attorney fees and costs.

## Count IV – Violation of Title VII 42 U.S.C. §§ 2000e, et seq.
## Retaliation Based on Prior EEO Activities

222.    The foregoing paragraphs are realleged and incorporated by reference herein.

223.    The Defendant's conduct as alleged herein above constitutes retaliation against the Plaintiff Karmen Young, because she engaged in Equal Employment Activities. Title VII, as amended, (§704(a) anti-retaliation provision "prohibits any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.

224.    Plaintiff's supervisors and the relevant decision makers were well aware that Plaintiff believed she had been discriminated against and that Plaintiff had engaged in prior protected EEO activities.

225.    Because of Plaintiff's belief and complaints regarding discrimination and his attempt to seek reinstatement, and a new position, Ms. Kinney, Gregory Keith, and members of the ERB, who they handpicked to select who is interviewed for the positions advertised, and which Plaintiff applied for, negatively altered the terms and conditions of Plaintiff's employment by precluding her from been interviewed and selected for those promotion positions, which were critical to Plaintiff's being promoted to either positions, and reinstated as a federal employee, at Ginnie Mae, which was of great interest to her.

226.    Defendant retaliated against Plaintiff when Defendant based their decision not to select Ms. Young for promotion, and allow her to reinter Ginnie Mae's workforce, because she had made prior EEO filings, and had warned and threatened Plaintiff never to file an EEO action again.

227.    Defendant and their agent's actions against Plaintiff, was retaliatory, because of her prior EEO activities. As a direct result, Plaintiff suffered anxiety, sleeplessness, depression, loss of

health, pain and suffering, emotional anguish, injury to professional standing, injury to character

and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and

alienation from personal acquaintances and professional peers.

228.    Ms. Kinney and her managers warning of Young to stop filing EEO complaints, was

classically intended to deter Plaintiff from engaging in further EEO activities against the Agency

and to discredit Plaintiff's previous EEO Claims against the Agency – the very thing Title VII

abhors.

229.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will

continue to suffer irreparable harm, pecuniary loses and other damages. Plaintiff is entitled to

declaratory relief, injunctive relief, and compensatory damages to make him whole in addition to

attorney fees and costs.

## Count V – Violation of Title VII 42 U.S.C. §§ 2000e, et seq. Retaliatory Hostile Work Environment

230.    The foregoing paragraphs are realleged and incorporated by reference herein.

231.    The Defendant's conduct as alleged above constitutes retaliatory hostile and abusive

working environment in violation of Title VII. Defendant's conducts against Plaintiff had no

justification whatsoever, and Defendant's management's denials, or reasons for their actions,

were mere pretext and cover up for their intentional Defendant's discriminatory animus, against

232.    Ms. Young, and inactions regarding Ms. Young's numerous complaints of abuse,

harassment, and hostility in the workplace, that no one cared to investigate or take any actions to

ameliorate, or punish the employees involved.

233.    The Agency has conducted itself intentionally, deliberately, willfully, and in callous disregard of the rights of under Title VII and the Agency's regulations against harassment and hostility in the workplace.

234.    For Plaintiff, the Agency created the Hostile Work Environment and allowed the Hostile work environment to continue in retaliation against Plaintiff because Plaintiff engaged in protected activities – Ms. Kinney made it clear to Ms. Young, that she and her managers were well aware that she had filed prior EEO complaints, and intimidated, and threatened her not to file another. After failing to investigate any of Plaintiff's EEO complaints, instead, they intimidated and threatened her.

235.    Mary Kinney's intentional false hostile, defamatory, and demeaning rumors against Plaintiff, and her spreading it all over Ginnie Mae workplace, were intended to deter Plaintiff from engaging in further EEO activities against the Agency and to discredit Plaintiff's previous EEO Claims against the Agency.

236.    Defendant's hostile actions against Plaintiff, directly caused Plaintiff to suffered anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish, injury to professional standing, injury to character and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and alienation from personal acquaintances and professional peers.

237.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered and will continue to suffer irreparable harm, pecuniary loses and other damages. Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory damages to make her whole in addition to attorney fees and costs.

## Count VI – Violation of Title VII 42 U.S.C. §§ 2000e, et seq.
## Denial of Equal Employment Opportunity And
## Failure to Promote and Reinstate

238.    The foregoing paragraphs are realleged and incorporated by reference herein.

239.    The Defendant's conduct as alleged above constitutes denial of equal employment

opportunity in violation of Title VII. Despite having worked for Ginnie May for eighteen (18)

years, and possessing not only institutional HUD/ Ginnie Mae knowledge, but also has more

specialized experience and management experience from the private sector, in the same

professional industry. Defendant did not even select her for interview, and she was never

interviewed for the positions of Counterparty Risk Analyst GS-1101-14, and Executive Vice

President & Chief Operating Officer, ES-1101-00, which Plaintiff applied for, in an attempt to be

reinstated back into Ginnie Mae federal employment, and promotion.

240.    By not interviewing Plaintiff, Defendant denied her equal employment opportunity in the

federal government service, without any lawful justification, in violation of Title VII.

241.    Not interviewing Plaintiff, as a deliberate and intentional pretext and cover up, for their

discriminatory animus against Plaintiff, as they hide behind the fact that she was not interview

without more.

242.    Defendant's senior management use of Executive Resources Board, members who they

handpicked, and who are their friends and subordinates, to select who should be interviewed was

also, a deliberate and intentional.  A pretext and cover up, for their discriminatory animus against

Plaintiff, and a calculated effort to forestall her being selected for the positions she was

eminently qualified, and to block her from ever re-entering federal employment at Ginnie Mae.

243.    Defendant Agency advertised two positions of employment in the Agency above Plaintiff

pay grade and level.

244.    Plaintiff was qualified for the positions she applied for.

245.    Plaintiff has an impeccable and unblemished federal service record during the eighteen (18) years, working for HUD/Ginnie Mae.

246.    Plaintiff's qualifications for the positions were demonstrated by her performance in the positions she had held, including positions those who connived to disrupt her career at Ginnie Mae, nominated and approved her for, based on her work ethic, and superb results record during her tenure at the agency from 1992-2013, and being at GS-13, for ten (10) years.

247.    Plaintiff was not selected for either of positions she applied for.

248.    Despite the fact that Plaintiff had clearly demonstrated her qualification for the jobs for which she was not selected, Employees outside of her protected class, who do not have the kind of in-house hands-on experience and knowledge of HUD/Ginnie Mae program, and who have not worked for the agency close to the years she worked for the agency, were selected for the positions, even though they were less qualified than Plaintiff, with no on the job actual performance as Plaintiff.

249.    The Defendant's decision to not select Plaintiff for either position, and to select for the positions less qualified candidates, was motivated by Plaintiff's race, color, retaliation against Plaintiff for engaging in EEO Activities against her, and also amounts to hostility.


250.    Defendant and their agent's actions against Plaintiff, was in violation of Title VII, and as a direct result, Plaintiff suffered anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish, injury to professional standing, injury to character and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and alienation from personal acquaintances and professional peers.

251.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff

suffered and will continue to suffer irreparable harm, pecuniary loses and other damages.

Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory damages to make

her whole in addition to attorney fees and costs.

### Count VII – Violation of ADEA as Amended, 29 U.S.C. §§ 621–634. Discrimination – Adverse Actions Based on Age

252.    Plaintiff incorporates by reference paragraphs 1 through … above, as if set forth herein

their entirety, and further alleges as follows:

253.    In 1974, Congress amended the ADEA 29 U.S.C. § 633a. Section 633a, to address

"nondiscrimination on account of age in Federal Government employment." that "all personnel

actions affecting employees or applicants for employment who are at least 40 years of age . . .

shall be made free from any discrimination based on age." 29 U.S.C. § 633(a).

254.    Plaintiff sought opportunities to be promoted, and reinstated back to her former federal

job with Ginnie Mae, by applying for three advertised positions, for promotion and her former

management superiors and supervisors denied her those opportunities she sought, even though

she was eminently qualified, because she was subject matter expert on the areas for the position,

but selected and promoted similarly situated employees, at GS-13, outside Plaintiff's protected

class, who did not have the same level of qualification and specialized experience, or

institutional Ginnie Mae HUD knowledge that Plaintiff who was an employee from 1995-2013

has. She did not get reinstated, and promoted to the position of Counterparty Risk Analyst GS-

1101-14, which she applied for, based on her age, because the individual who was selected and

promoted had only worked for Ginnie Mare for few years, and was (about 31 years) younger

than Plaintiff (over 50 years).

255.    Defendant and their agent's actions against Plaintiff, was discriminatory, as they took

adverse employment action against Plaintiff, because of her age. And as a direct result, Plaintiff

suffered anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish,

injury to professional standing, injury to character and reputation and credit standing,

humiliation, loss of esteem, sought medical treatment, and alienation from personal

acquaintances and professional peers.

256.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff

suffered and will continue to suffer irreparable harm, pecuniary loses and other damages.

Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory damages to make

her whole in addition to attorney fees and costs.


### Count VIII – Violation of ADEA as Amended, 29 U.S.C. §§ 621–634
### Retaliation Based on Prior EEO Activities

257.    The foregoing paragraphs are realleged and incorporated by reference herein, and

Plaintiff further alleges as follows:


258.    The Defendant's conduct as alleged herein above constitutes retaliation against the

Plaintiff Karmen Young, because she engaged in Equal Employment Activities. Title VII, as

amended, (§704(a) anti-retaliation provision, which is also applicable to ADEA claims,

"prohibits any adverse treatment that is based on a retaliatory motive and is reasonably likely to

deter the charging party or others from engaging in protected activity.

259.    Plaintiff's supervisors and the relevant decision makers were well aware that Plaintiff

believed she had been discriminated against and that Plaintiff had engaged in prior protected EEO activities. Because of Plaintiff's belief and complaints regarding discrimination and his attempt to seek reinstatement, and a new position, Ms. Kinney, Gregory Keith, and members of the ERB, who they handpicked to select who is interviewed for the positions advertised, and which Plaintiff applied for, negatively altered the terms and conditions of Plaintiff's employment by precluding her from been interviewed and selected for those promotion positions, which were critical to Plaintiff's being promoted to either positions, and reinstated as a federal employee, at Ginnie May, which was of great interest to her.

260.    Defendant and their agent's actions against Plaintiff, was retaliatory, because of her prior EEO activities. As a direct result, Plaintiff suffered anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish, injury to professional standing, injury to character and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and alienation from personal acquaintances and professional peers.

261.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer irreparable harm, pecuniary loses and other damages. Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory damages to make him whole in addition to attorney fees and costs.

### Count IX – Violation of ADEA as Amended, 29 U.S.C. §§ 621–634
### Harassment Hostile Work Environment

262.    Plaintiff incorporates by reference paragraphs 1 through … above, as if set forth herein their entirety, and further alleges as follows:

263.    Ms. Young working for HUD/Ginnie Mae, from 1995 – 2013. During that period, Young suffered several incidents of assault, intimidation, harassment, hostility, that her superiors and

management condoned that created a toxic and hostile work environment. Plaintiff reported those incidents to her first- and second-line supervisors at the time, and Ginnie Mae management, but they all failed to respond to these incidents or take any corrective action, or reprimand those who were responsible for the unlawful acts against her. Among her superiors that she reported to for example, were, Christopher Haspel, Foster, Michael Dwayne, Theordore Foster, were all white Caucasian men, who did nothing to stop the abuse against her, because the abuse was also from white Caucasians, and mainly men.

264.    By committing the foregoing acts of harassment hostile work environment discrimination, against Plaintiff, Defendant violated Title VII

265.    Said violations were intentionally done to injure Plaintiff in her employment with Ginie Mae, and warrants imposition of damages.

266.    As a direct result of said actions, Plaintiff suffered anxiety, sleeplessness, depression, loss of health, pain and suffering, emotional anguish, injury to professional standing, injury to character and reputation and credit standing, humiliation, loss of esteem, sought medical treatment, and alienation from personal acquaintances and professional peers.

267.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered and will continue to suffer irreparable harm, pecuniary loses and other damages. Plaintiff is entitled to declaratory relief, injunctive relief, and compensatory damages to make him whole in addition to attorney fees and costs.

## VI. RELIEF

A.    Plaintiff requests a declaratory judgment in Plaintiff's favor in all Counts.

B.    An order enjoining Defendant from further discrimination against plaintiff in the future, and other employees of HUD.

C.    Plaintiff seeks compensatory damages and attorney's fees and costs in amounts to be later determined.

D.    Plaintiff requests other and further relief as justice may require.

## VII. DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury.

Respectfully submitted this 2nd day of August, 2023.

/s/ Charity C. Emeronye Swift
Charity C. Emeronye Swift DC Bar No. 198209
Stephen Christopher Swift DC Bar No. 428459
Swift & Swift, Attorneys at Law, P.L.L.C.
Suite 200
2121 Eisenhower Avenue
Alexandria, Virginia 22314-4688
Telephone: (703) 418 – 0000
Facsimile: (703) 535 – 8205
E-mail: charity@swift.law.pro
          steve@swift.law.pro

For Plaintiff Karmen Young

**DEFINE THE ISSUE (from ROI)**

Whether the U.S. Department of Housing & Urban Development, Office of Government National Mortgage Association (GNMA) discriminated against the Aggrieved Party (AP) based on her ==race== (African-American), ==color== (Darker Complexion), ==sex== (Female), ==age== (50), and ==retaliation== (Prior EEO Activity) when she was not selected for the vacant positions of Executive Vice-President & Chief Operating Officer, ES-1101-00, advertised under vacancy announcement number ER-16-002 and Risk Analyst, GS-1101-14/14, advertised under vacancy announcement numbers: 15-HUD-408 and 15-HUD-409P. AP also alleges that she was subjected to slander and derogatory comments directed at her by a former Executive Vice-President and Chief Operating Officer Mary Kinney.

**Issues (from judge Tran's summary judgment order)**

Whether the Office of Government National Mortgage Association (GNMA) discriminated against Complainant on the bases of ==race== (African American), ==color== (dark skinned), ==sex== (female), ==age== (YOB:1966), and ==reprisal== (prior EEO activity) when:

1. On or around February 10, 2017, Complainant discovered that she was not selected for the position of Executive Vice President and Chief Operation Officer, ES-1101-00 advertised under vacancy announcement number ER-16-002, and

2. On or around February 10, 2017, Complainant discovered that she was not selected for the position of Risk Analyst, GS-1101-14/14, advertised under vacancy announcement numbers: 15-HUD-408 and 15-HUD-409P.

Claims:

Discrimination Based on: Race, African American  )

Discrimination Based on: Color, Dark skinned  )  Title VII and DCHA

Discrimination Based on: Sex (female)  )

Discrimination Based on: Age (over 40 (50))  )  ADEA and DCHA

Retaliation/Reprisal: Protected Activity  )  Title VII, ADEA, and DCHA.

Retaliation/Reprisal: Protected Activity  )